A CERTIFIED TRUE COPY

ATTEST

By Mecca Thompson at 8:20 am, Nov 06, 2007

FOR THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

8:19 am, Nov 06, 2007

FILED
CLERK'S OFFICE

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

## IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk
By _____
Deputy Clerk

### TRANSFER ORDER

**Before the entire Panel**[*]: Plaintiffs in four actions have moved, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings of this litigation as follows: (1) one plaintiff in the District of New Jersey action has moved for centralization in the District of New Jersey; (2) plaintiffs in two District of District of Columbia actions have moved for centralization in the District of District of Columbia; and (3) plaintiff in one Eastern District of Pennsylvania action has moved for centralization in the Eastern District of Pennsylvania. All responding parties agree that centralization is appropriate and variously support one or more of the previous three suggested districts or the Northern District of Alabama, the Middle District of Florida or the Northern District of Illinois as transferee forum.

This litigation currently consists of thirteen actions listed on Schedule A and pending in six districts as follows: six actions in the District of District of Columbia; two actions each in the Northern District of Illinois and the Eastern District of Pennsylvania; and one action each in the Northern District of Alabama, the Middle District of Florida, and the District of New Jersey.[1]

On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization under Section 1407 in the District of District of Columbia will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share factual questions relating to allegations that defendants conspired to fix prices of rail fuel surcharges in violation of the Sherman Antitrust Act for rail freight transportation pursuant to private contracts and other means exempt from federal rate regulation. Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources

---

[*] Judge Motz did not participate in the decision of this matter.

[1] Two of the motions before the Panel included four actions in the District of New Jersey. Those actions have been consolidated. In addition, the Panel has been notified that one other related action has been filed in the District of District of Columbia. This action will be treated as a potential tag-along action. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

-2-

of the parties, their counsel and the judiciary.

We are persuaded that the District of District of Columbia is an appropriate transferee forum for this litigation. Several actions are already pending there. In addition, defendant Association of American Railroads is located in this district and may be a source of discovery.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of District of Columbia are transferred to the District of District of Columbia and, with the consent of that court, assigned to the Honorable Paul L. Friedman for coordinated or consolidated pretrial proceedings with the actions pending there and listed on Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

D. Lowell Jensen          J. Frederick Motz
Robert L. Miller, Jr.     Kathryn H. Vratil
David R. Hansen           Anthony J. Scirica

I HEREBY CERTIFY that the above
is a true and correct copy of
the original on file in my office

WALSH, Clerk
District Court
New Jersey

Deputy Clerk

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION                                    MDL No. 1869

## SCHEDULE A

#### Northern District of Alabama

West Alabama Sand & Gravel, Inc. v. CSX Transportation, Inc., et al., C.A. No. 7:07-1191

#### District of District of Columbia

Dakota Granite Co. v. Association of American Railroads, et al., C.A. No. 1:07-1078
McIntyre Group, Ltd. v. Association of American Railroads, et al., C.A. No. 1:07-1101
GVL Pipe & Demolition, Inc. v. Association of American Railroads, et al., C.A. No. 1:07-1119
Ferraro Foods of North Carolina, LLC v. Association of American Railroads, et al.,
    C.A. No. 1:07-1121
Sublette Cooperative, Inc. v. Association of American Railroads, et al., C.A. No. 1:07-1126
Strates Shows, Inc. v. Association of American Railroads, et al., C.A. No. 1:07-1127

#### Middle District of Florida

Cedar Farms Co., Inc. v. CSX Transportation, Inc., et al., C.A. No. 3:07-557

#### Northern District of Illinois

Dad's Products Co., Inc. v. BNSF Railway Co., et al., C.A. No. 1:07-2954
Zinifex Taylor Chemicals, Inc. v. CSX Transportation, Inc., et al., C.A. No. 1:07-3274

#### District of New Jersey

Dust Pro, Inc. v. CSX Transportation, Inc., et al., C.A. No. 2:07-2251 CA 1-07-2061

#### Eastern District of Pennsylvania

Quality Refractories Installation, Inc. v. Association of American Railroads, et al.,
    C.A. No. 2:07-2657
Nizhnekamskneftekhim USA, Inc. v. CSX Transportation, Inc., et al., C.A. No. 2:07-2809

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Daniel Brockett
David Azar
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Stephen Neuwirth
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Paul Donovan
LAROE, WINN, MOERMAN &
DONOVAN
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DUST PRO, INC., on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY, <br><br> Defendants. | Civil Action No. <br><br><br><br> **CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dust Pro, Inc. ("Dust Pro" or "Plaintiff"), an Arizona corporation located in Phoenix, Arizona, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.    This is an antitrust class action charging five United States based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.    Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3.     As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property.  Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.     Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.  Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

5.     Plaintiff Dust Pro, Inc. is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona, 85034.

6.     During the class period, Dust Pro manufactured and distributed soil stabilizers.

7.     Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation.  The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein.  Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.  Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

3

8.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

9.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10.    Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11.    Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens

4

of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas  76131. In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey  08094. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska  68179. In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown. UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14.     Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873. It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

15.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of

the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class"

is defined as:

> All purchasers of rail freight transportation services from Defendants
> (the "Class"), through use of private railroad-shipper contracts or
> through other means exempt from rate regulation under federal law,
> as to which Defendants assessed a Rail Fuel Surcharge, at any time
> from at least as early as July 2003 to the present (the "Class Period").
> Excluded from the Class are Defendants, any subsidiaries or affiliates
> of Defendants, and any of Defendants' co-conspirators, whether or
> not named as a Defendant in this Complaint.

20.    The Class is so numerous that joinder of all members is impracticable. Given the

magnitude of the commerce involved, the members of the Class are geographically dispersed, and

joinder of all class members would be impracticable. While the exact number of Class members is

unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of

members of the Class and that their identities can be readily ascertained from Defendants' books and

records.

21.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and all members of the Class directly purchased unregulated rail freight transportation from

Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges

established and maintained by the actions of Defendants in connection with the restraint of trade

alleged herein. Plaintiff and the members of the Class have all sustained damage in that they paid

inflated prices for the unregulated rail freight transportation services at issue as a result of

Defendants' conduct in violation of federal law.

22.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and have retained counsel competent and experienced in class action and antitrust litigation.

7

23.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services  purchased by the Class;

b.    Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c.    Whether Defendants' conduct violated the federal antitrust laws; and

d.    Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

24.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25.    The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable.  The

amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

26.   During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

27.   The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28.   The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

29.   Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30.   Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

9

31.    Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32.    Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

33.    The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids."  Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

## THE RAILROADS INTRODUCE FUEL SURCHARGES

34.    By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review.  Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice:  build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity.  The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation.   In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.     Predictably, that is what happened. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE FIXING CONSPIRACY

37.     Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (i.e., revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

11

38.    Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

39.    Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

40.    As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

41.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

42.    The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

43.     Defendants applied the same unreasonable fuel surcharge practices to the private rail

freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

44.     The essential element of Defendants' conspiracy was an agreement to compute Rail

Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was

applied, but as a multiplier percentage of the base rate charged for the rail freight transportation

involved.  Defendants applied these surcharges not only to published tariff rates, but to private

contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates

at issue here).

45.     Defendants began to implement their conspiracy at least as early as June 2003 when

the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices

relative to Rail Fuel Surcharges.    Prior to this time, the UP carload fuel surcharge was adjusted

monthly based on the West Texas Intermediate ("WTI") Crude Oil Index.  The BNSF carload fuel

surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index

("HDF").  In or about June 2003, however, the UP switched to the HDF Index pursuant to an

agreement with the BNSF.    From that point on, the Western Railroads moved in lockstep and

charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

46.     The Western Railroads agreed to administer the HDF index in precisely the same

way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was

lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per

gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent

increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55 per gallon, the

13

Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47.     The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48.     The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

49.     Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50.     The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |

| MONTH | BNSF | UP |
|---|---|---|
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|-------|------|----|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

51.    Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*. Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53.    The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same

fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54.     The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

55.     The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56.     The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|-------|-----|-----|-----|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |

| MONTH | CSX | NS | KCS |
|-------|-----|-----|-----|
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

57.    In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a

percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.

Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

### ADDITIONAL EVIDENCE OF A CONSPIRACY

58.     Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.     The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b.     There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.    Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.    The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

---

[1]    A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

59.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60.     Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  The other Defendants refused to address the concerns of their customers.

61.     At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly.  Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  This behavior gives rise to an inference of price fixing.

63.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.  Instead, Defendants moved to what is known

in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64.    Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

65.    Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66.    Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

67.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

       a.    The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

       b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

       c.    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of § 1 Of The Sherman
### Act And § 4 Of The Clayton Act)

69.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73.    The contract, combination or conspiracy has had the following effects:

    a.    Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

    c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

24

74.     As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have

suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to

unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under
        Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be
        denominated as class representative, and that plaintiff's counsel be appointed as
        counsel for the Class;

(2)     That the unlawful contract, combination and conspiracy alleged in Count I be
        adjudged and decreed to be an unreasonable restraint of trade or commerce in
        violation of Section 1 of the Sherman Act;

(3)     That plaintiff and the Class recover compensatory damages, as provided by law,
        determined to have been sustained as to each of them, and that judgment be entered
        against Defendants on behalf of plaintiff and each and every member of the Class;

(4)     That each of the Defendants' respective officers, directors, agents and employees,
        and all other persons acting on behalf of or in concert with them, be permanently
        enjoined and restrained from, directly or indirectly, continuing or maintaining the
        combination, conspiracy, or agreement alleged in this case;

(5)     That plaintiff and the Class recover treble damages, as provided by law;

(6)     That plaintiff and the Class recover their costs of the suit, including attorney's fees,
        as provided by law; and

(7)     For such further relief as the Court may deem just and proper.

                                        CARELLA, BYRNE, BAIN, GILFILLAN,
                                        CECCHI, STEWART & OLSTEIN
                                        Attorneys for Plaintiff

                                        By:___/s/ James E. Cecchi_____
                                              JAMES E. CECCHI

Dated:  May 14, 2007

Stephen Neuwirth
Quinn Emanuel Urquhart Oliver
     & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Daniel Brockett
David Azar
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial as to all issues triable by a jury.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By:___ /s/ James E. Cecchi_____
       JAMES E. CECCHI

Dated:  May 14, 2007

## CERTIFICATION

Counsel for Plaintiff hereby certifies that, to the best of their knowledge, there are no other

civil actions or arbitration proceedings pending regarding the subject matter hereof and that none are

contemplated, and that all parties who should be joined have been joined.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By:___ /s/ James E. Cecchi_____
       JAMES E. CECCHI

Dated:  May 14, 2007

CLOSED, LEAD, MDL1869

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:07-cv-02251-DMC-MF
### Internal Use Only

| | |
|---|---|
| DUST PRO, INC. v. CSX TRANSPORTATION, INC. et al | Date Filed: 05/14/2007 |
| Assigned to: Judge Dennis M. Cavanaugh | Date Terminated: 11/28/2007 |
| Referred to: Magistrate Judge Mark Falk | Jury Demand: Plaintiff |
| Member cases: | Nature of Suit: 410 Anti-Trust |
|     2:07-cv-02289-DMC-MF | Jurisdiction: Federal Question |
|     2:07-cv-02769-DMC-MF | |
|     2:07-cv-02832-DMC-MF | |
|     2:07-cv-03006-DMC-MF | |
|     2:07-cv-03019-DMC-MF | |
|     2:07-cv-03037-DMC-MF | |
| Cause: 15:15 Antitrust Litigation | |

**Plaintiff**

| | | |
|---|---|---|
| **DUST PRO, INC.** *on behalf of itself and all others similarly situated* | represented by | **JAMES E. CECCHI** CARELLA BYRNE BAIN GILFILLAN CECCHI STEWART & OLSTEIN, PC 5 BECKER FARM ROAD ROSELAND, NJ 07068 (973) 994-1700 Fax: (973) 994-1744 Email: jcecchi@carellabyrne.com *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **LINDSEY H. TAYLOR** CARELLA BYRNE BAIN GILFILLAN CECCHI STEWART & OLSTEIN, PC 5 BECKER FARM ROAD ROSELAND, NJ 07068 (973) 994-1700 Email: ltaylor@carellabyrne.com *ATTORNEY TO BE NOTICED* |

**Consol Plaintiff**

| | | |
|---|---|---|
| **ISSAC INDUSTRIES, INC.** *on behalf of itself and all others similarly situated* | represented by | **JAMES E. CECCHI** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**LINDSEY H. TAYLOR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**LANCASTER FOUNDRY SUPPLY**          represented by   **JAMES E. CECCHI**
**COMPANY, INC.**                                       (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**WILLIAM J. PINILIS**
KAPLAN, FOX & KILSHEIMER, LLP

237 SOUTH STREET
MORRISTOWN, NJ 07962
(973) 401-1111
Email:
wpinilis@consumerfraudlawyer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LISA J. RODRIGUEZ**
(See above for address)

**Consol Plaintiff**

**SOMERSET INDUSTRIES, INC.**          represented by   **JAN MEYER**
                                                        LAW OFFICES OF JAN MEYER
                                                        1029 TEANECK ROAD
                                                        2ND FLOOR
                                                        TEANECK, NJ 07666
                                                        (201) 862-9500
                                                        Email: jmeyer@janmeyerlaw.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**MAROON INCORPORATED**                represented by   **JARED BENNETT STAMELL**
*on behalf of itself and all others*                    STAMELL & SCHAGER, LLP
*similary situated*                                     ONE LIBERTY PLAZA
                                                        35TH FLOOR
                                                        NEW YORK, NY 10006-1404
                                                        (212) 566-4047
                                                        Email: stamell@ssnyc.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**COMPLETE TRANSPORTATION**            represented by   **CHRISTOPHER A. SEEGER**
**SYSTEMS, INC.**                                       SEEGER WEISS, LLP

*on behalf of itself and all others*
*similary situated*

550 BROAD STREET
NEWARK, NJ 07102
(973) 639-9100
Email: cseeger@seegerweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**STATELINE BEAN PRODUCERS**
**COOPERATIVE**

represented by **LISA J. RODRIGUEZ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**AGWAY LIQUIDATING TRUST**
*on behalf of itself and all others*
*similarly situated*

represented by **JARED BENNETT STAMELL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**FAYUS ENTERPRISES**
*on behalf of itself and all others*
*similarly situated*

represented by **LISA J. RODRIGUEZ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Mary B. Mason*

V.

**Defendant**

**CSX TRANSPORTATION, INC.**

represented by **MICHAEL R. GRIFFINGER**
GIBBONS, PC
ONE GATEWAY CENTER
NEWARK, NJ 07102-5310
(973) 596-4500
Email: griffinger@gibbonslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALYCHIA LYNN BUCHAN**
PROSKAUER ROSE LLP
ONE NEWARK CENTER
NEWARK, NJ 07102-5310
(973) 297-3236
Email: abuchan@proskauer.com
*ATTORNEY TO BE NOTICED*

**GHILLAINE A. REID**
GIBBONS, PC
ONE GATEWAY CENTER
NEWARK, NJ 07102-5310

(973) 596-4500
Email: greid@gibbonslaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**BNSF RAILWAY COMPANY**

**Defendant**

**UNION PACIFIC RAILROAD COMPANY**

represented by **WILLIAM J. O'SHAUGHNESSY**
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
PO BOX 652
NEWARK, NJ 07101-0652
(973) 622-4444
Email: woshaughnessy@mccarter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**NORFOLK SOUTHERN RAILWAY COMPANY**

represented by **DONALD A. ROBINSON**
ROBINSON & LIVELLI, ESQS.
TWO PENN PLAZA EAST
SUITE 1100
NEWARK, NJ 07105-2237
(973) 690-5400
Email: drobinson@robinsonlivelli.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KANSAS CITY OF SOUTHERN RAILWAY COMPANY**

represented by **MICHAEL S. GUGIG**
SONNENSCHEIN, NATH &
ROSENTHAL, LLP
1221 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
(212) 768-6700
Email: mgugig@sonnenschein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2007 | ❶1 | COMPLAINT against CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, KANSAS CITY OF SOUTHERN RAILWAY COMPANY ( Filing fee $ 350 receipt number 1477698.) JURY DEMAND, filed by DUST PRO, INC.. (Attachments: # 1 Statement 7.1 disclosure# 2 Civil Cover Sheet # 3 Summons BNSF# 4 |

| | | |
|---|---|---|
| | | Summons CSX# 5 Summons KANSAS CITY# 6 Summons NORFOLK# 7 Summons UNION PACIFIC)(mn, ) (Entered: 05/15/2007) |
| 05/15/2007 | 2 | Summons Issued as to CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, KANSAS CITY OF SOUTHERN RAILWAY COMPANY.Days Due - 20. (MAILED TO COUNSEL) (mn, ) (Entered: 05/15/2007) |
| 05/15/2007 | 3 | NOTICE of Appearance by LINDSEY H. TAYLOR on behalf of DUST PRO, INC. (TAYLOR, LINDSEY) (Entered: 05/15/2007) |
| 05/21/2007 | 4 | AFFIDAVIT of Service for Summons and Complaint served on BNSF Railway Company on 05/16/2007, filed by DUST PRO, INC.. (TAYLOR, LINDSEY) (Entered: 05/21/2007) |
| 05/24/2007 | 5 | SUMMONS Returned Executed by DUST PRO, INC.. CSX TRANSPORTATION, INC. served on 5/17/2007, answer due 6/6/2007. (TAYLOR, LINDSEY) (Entered: 05/24/2007) |
| 05/24/2007 | 6 | SUMMONS Returned Executed by DUST PRO, INC.. NORFOLK SOUTHERN RAILWAY COMPANY served on 5/17/2007, answer due 6/6/2007. (TAYLOR, LINDSEY) (Entered: 05/24/2007) |
| 05/24/2007 | 7 | SUMMONS Returned Executed by DUST PRO, INC.. UNION PACIFIC RAILROAD COMPANY served on 5/17/2007, answer due 6/6/2007. (TAYLOR, LINDSEY) (Entered: 05/24/2007) |
| 05/29/2007 | 8 | SUMMONS Returned Executed by DUST PRO, INC.. KANSAS CITY OF SOUTHERN RAILWAY COMPANY served on 5/22/2007, answer due 6/11/2007. (TAYLOR, LINDSEY) (Entered: 05/29/2007) |
| 05/30/2007 | 9 | Letter from James E. Cecchi regarding request for early case management conference. (CECCHI, JAMES) (Entered: 05/30/2007) |
| 06/04/2007 | 10 | STIPULATION *and Proposed Order Extending All Defendants' Time to Answer or Otherwise Move* by CSX TRANSPORTATION, INC.. (Attachments: # 1 Text of Proposed Order Extending All Defendants' Time to Answer or Otherwise Move)(GRIFFINGER, MICHAEL) (Entered: 06/04/2007) |
| 06/04/2007 | 11 | NOTICE of Appearance by MICHAEL R. GRIFFINGER on behalf of CSX TRANSPORTATION, INC. (GRIFFINGER, MICHAEL) (Entered: 06/04/2007) |
| 06/04/2007 | 12 | NOTICE of Appearance by GHILLAINE A. REID on behalf of CSX TRANSPORTATION, INC. (REID, GHILLAINE) (Entered: 06/04/2007) |
| 06/04/2007 | 13 | Letter from Michael Griffinger to Honorable Judge Dennis M. Cavanaugh. (GRIFFINGER, MICHAEL) (Entered: 06/04/2007) |
| 06/05/2007 | 14 | MDL MOTION to Transfer related action to Dist of New Jersey pursuant to 28USC 1407 by DUST PRO, INC.. (Attachments: # 1 Brief # 2 |

| | | |
|---|---|---|
| | | Certificate of Service # 3 Revised schedule of actions)(cs, ) (Entered: 06/06/2007) |
| 06/05/2007 | 🅞 | (Court only) ***Motions terminated: 14 MOTION to Transfer Case Pending in the Northern Dist of Illinois to Dist of New Jersey filed by DUST PRO, INC.. (cs, ) (Entered: 06/06/2007) |
| 06/06/2007 | 🅞15 | Letter from James E. Cecchi regarding Case Managment Conference re 9 Letter, 13 Letter. (CECCHI, JAMES) (Entered: 06/06/2007) |
| 06/06/2007 | 🅞16 | STIPULATION/ORDER extending time for all defts to answer until 8/11/07. Signed by Judge Dennis M. Cavanaugh on 6/6/07. (sr, ) (Entered: 06/07/2007) |
| 06/12/2007 | 🅞17 | NOTICE of Appearance by MICHAEL S. GUGIG on behalf of KANSAS CITY OF SOUTHERN RAILWAY COMPANY (GUGIG, MICHAEL) (Entered: 06/12/2007) |
| 06/18/2007 | 🅞 | Set Hearings: Status Conference set for 6/22/2007 11:00 AM in Newark - Courtroom 4 before Judge Dennis M. Cavanaugh. THE CONFERENCE WILL DISCUSS WHERE THE CASE IS HEADED AND WHAT DISCOVERY IS NEEDED. COUNSEL ARE TO NOTIFY THOSE INVOLVED OF THIS CANFERENCE THAT DID NOT RECEIVE THIS E-MAIL NOTIFICATION. (spc, ) (Entered: 06/20/2007) |
| 06/19/2007 | 🅞18 | First MOTION for Leave to Appear Pro Hac Vice by CSX TRANSPORTATION, INC.. (Attachments: # 1 Certification Ghillaine A. Reid# 2 Certification Kathryn D. Kirmayer# 3 Certification Kent A. Gardiner# 4 Certification Richard McMillan# 5 Text of Proposed Order Granting Admission of Richard McMillan, Kent A Gardiner, and Kathryn D. Kirmayer Pro Hac Vice# 6 Certification Service)(REID, GHILLAINE) (Entered: 06/19/2007) |
| 06/20/2007 | 🅞 | Set Deadline as to 18 First MOTION for Leave to Appear Pro Hac Vice. Motion Hearing set for 7/23/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 06/20/2007) |
| 06/20/2007 | 🅞19 | Letter from Lindsey H. Taylor Regarding Pro Hac Vice Admissions. (Attachments: # 1 Declaration of Stephen Neuwirth# 2 Declaration of Daniel L. Brockett# 3 Declaration of David Azar# 4 Declaration of Paul Donovan# 5 Text of Proposed Order)(TAYLOR, LINDSEY) (Entered: 06/20/2007) |
| 06/20/2007 | 🅞20 | Letter from Michael S. Gugig to Hon. Mark Falk. (Attachments: # 1 Declaration Declaration of Michael S. Gugig# 2 Declaration Declaration of Reid L. Ashinoff# 3 Text of Proposed Order Proposed order granting pro hac vice admission to Reid L. Ashinoff)(GUGIG, MICHAEL) (Entered: 06/20/2007) |
| 06/21/2007 | 🅞21 | Letter from Lindsey H. Taylor Regarding Pro Hac Vice Admissions. (Attachments: # 1 Declaration of Richard Scruggs# 2 Declaration of |

| | | |
|---|---|---|
| | | Sidney Backstrom# 3 Text of Proposed Order)(TAYLOR, LINDSEY) (Entered: 06/21/2007) |
| 06/21/2007 | ●22 | NOTICE of Appearance by DONALD A. ROBINSON on behalf of NORFOLK SOUTHERN RAILWAY COMPANY (ROBINSON, DONALD) (Entered: 06/21/2007) |
| 06/22/2007 | ●23 | Letter from James E. Cecchi enclosing Proposed Case Management Order. (Attachments: # 1 Text of Proposed Order)(CECCHI, JAMES) (Entered: 06/22/2007) |
| 06/22/2007 | ●24 | Minute Entry for proceedings held before Judge Dennis M. Cavanaugh : Status Conference held on 6/22/2007. (Court Reporter Charles McGuire.) (spc, ) (Entered: 06/28/2007) |
| 07/09/2007 | ●25 | Letter from Defendants in Response to Richard Scruggs Pro Hac Vice Application re 19 Letter,. (Attachments: # 1 Exhibit Memorandum Opinion Issued on June 21, 2007)(GRIFFINGER, MICHAEL) (Entered: 07/09/2007) |
| 07/09/2007 | ●26 | Letter from Stephen R. Neuwirth Submitting Proposed Case Managment Order and Stipulation Extending Time to Submit Document Preservation Order. (Attachments: # 1 Text of Proposed Order Case Management Order# 2 Text of Proposed Order Stiplation Extending Time to Submit Document Preservation Order)(TAYLOR, LINDSEY) (Entered: 07/09/2007) |
| 07/11/2007 | ●27 | Letter from Stephen R. Neuwirth Enclosing Proposed Document Preservation Order. (Attachments: # 1 Text of Proposed Order) (TAYLOR, LINDSEY) (Entered: 07/11/2007) |
| 07/16/2007 | ●28 | STIPULATION/ORDER regarding the preservation of documents and electronically stored information. Signed by Judge Dennis M. Cavanaugh on 7/13/07. (sr, ) (Entered: 07/16/2007) |
| 07/17/2007 | ●29 | ORDER consolidating for all purposes civ. 07-2289, civ. 07-2769, civ. 07-2832, civ. 07-3006, civ. 07-3019 and civ. 07-3037 into civ. 07-2251; All future related actions shall also be consolidated with the consolidated actions. The Clerk shall provide a copy of this Order to counsel in subsequently filed related actions; time is extended for all defts. to answer complaints in the consolidated action until 9/28/2007.. Signed by Judge Dennis M. Cavanaugh on 7/17/2007. (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Party ISSAC INDUSTRIES, INC. rep by LISA J. RODRIGUEZ added. ( civ. 07-2289) (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Party BAR-ALE, INC. rep by LISA J. RODRIGUEZ added. (CIV. 07-2769) (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Set/Clear Flags (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Party UNITED CO-OPERATIVE FARMERS, INC. rep by LISA J. RODRIGUEZ added. (civ. 07-2832) (mn, ) (Entered: 07/17/2007) |

| 07/17/2007 | ● | (Court only) ***Party CARTER DISTRIBUTING COMPANY rep by JAMES E. CECCHI, LINDSEY H. TAYLOR added. (CIV. 07-3006) (mn, ) (Entered: 07/17/2007) |
|---|---|---|
| 07/17/2007 | ● | (Court only) ***Party BLUE GRASS TOBACCO COMPANY rep by JAMES E. CECCHI, LINDSEY H. TAYLOR added. (CIV. 07-3019) (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Party LANCASTER FOUNDRY SUPPLY COMPANY, INC. rep by WILLIAM J. PINILIS added. (CIV. 07-3037) (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ● | (Court only) ***Case association terminated: to 2:07-cv-02289-DMC-MF, to 2:07-cv-03037-DMC-MF, to 2:07-cv-03006-DMC-MF, to 2:07-cv-03019-DMC-MF, to 2:07-cv-02832-DMC-MF, to 2:07-cv-02769-DMC-MF. (mn, ) (Entered: 07/17/2007) |
| 07/17/2007 | ●30 | AMENDED COMPLAINT *CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT* against CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, KANSAS CITY OF SOUTHERN RAILWAY COMPANY, filed by UNITED CO-OPERATIVE FARMERS, INC., CARTER DISTRIBUTING COMPANY, BLUE GRASS TOBACCO COMPANY, LANCASTER FOUNDRY SUPPLY COMPANY, INC., DUST PRO, INC., ISSAC INDUSTRIES, INC., BAR-ALE, INC..(CECCHI, JAMES) (Entered: 07/17/2007) |
| 07/20/2007 | ●31 | Letter from James E. Cecchi Regarding Pro Hac Vice Admission of Richard Scruggs and Sidney Backstrum re 25 Letter, 21 Letter. (Attachments: # 1 Declaration of Counsel# 2 Exhibit A to Declaration of Counsel# 3 Exhibit B to Declaration of Counsel# 4 Exhibit C to Declaration of Counsel# 5 Exhibit D to Declaration of Counsel# 6 Exhibit E to Declaration of Counsel)(CECCHI, JAMES) (Entered: 07/20/2007) |
| 07/23/2007 | ●32 | Letter from Lindsey H. Taylor Enclosing Proposed Order Consolidating Somerset Industries Action. (Attachments: # 1 Text of Proposed Order) (TAYLOR, LINDSEY) (Entered: 07/23/2007) |
| 07/23/2007 | ●33 | ORDER granting admission of Richard McMillan, Kent A. Gardiner and Kathryn D. Kirmayer pro hac vice (07-2289). Signed by Judge Mark Falk on 7/23/07. (jd, ) (Entered: 07/23/2007) |
| 07/23/2007 | ●34 | ORDER granting Robert N. Kaplan pro hac vice admission (07-2289). Signed by Judge Mark Falk on 7/23/07. (jd, ) (Entered: 07/23/2007) |
| 07/23/2007 | ●35 | ORDER granting Gregory K. Arenson pro hac vice admission (07-2289). Signed by Judge Mark Falk on 7/23/07. (jd, ) (Entered: 07/23/2007) |
| 07/23/2007 | ●36 | ORDER admitting Richard McMillan, Kent A. Gardiner & Kathryn D. Kirmayer pro hac vice. Signed by Judge Mark Falk on 7/23/07. (sr, ) (Entered: 07/23/2007) |

| 07/23/2007 | ●37 | ORDER admitting Reid L. Ashinoff pro hac vice. Signed by Judge Mark Falk on 7/23/07. (sr, ) (Entered: 07/23/2007) |
|---|---|---|
| 07/23/2007 | ●38 | ORDER admitting Stephen Neuwirth, Daniel Brockett, David Azar,& Paul Donovan pro hac vice. Signed by Judge Mark Falk on 7/23/07. (sr, ) (Entered: 07/23/2007) |
| 07/25/2007 | ● | (Court only) ***Party SOMERSET INDUSTRIES, INC. rep by JAN MEYER added. (sr, ) (Entered: 07/25/2007) |
| 07/26/2007 | ● | (Court only) ***Motions terminated: 18 First MOTION for Leave to Appear Pro Hac Vice filed by CSX TRANSPORTATION, INC. (LM, ) (Entered: 07/26/2007) |
| 07/27/2007 | ●39 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) for Attorneys Robert N. Kaplan and Gregory K. Arenson by UNITED CO-OPERATIVE FARMERS, INC., ISSAC INDUSTRIES, INC., BAR-ALE, INC.. (RODRIGUEZ, LISA) (Entered: 07/27/2007) |
| 07/27/2007 | ●40 | Notice of Request by Pro Hac Vice Robert N. Kaplan and Gregory K. Arenson to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 07/27/2007) |
| 07/27/2007 | ●41 | MOTION for Leave to Appear Pro Hac Vice *for Attorney Linda P. Nussbaum* by ISSAC INDUSTRIES, INC.. (Attachments: # 1 Statement As To Why No Brief Is Necessary# 2 Certification of Lisa J. Rodriguez# 3 Certification of Linda P. Nussbaum, Esquire, in Support of the Motion for Pro Hac Vice Admission# 4 Text of Proposed Order # 5 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 07/27/2007) |
| 07/27/2007 | ● | (Court only) ***Party ROBERT N. KAPLAN, and GREGORY K. ARENSON added. (sr, ) (Entered: 07/27/2007) |
| 07/27/2007 | ●42 | MOTION for Leave to Appear Pro Hac Vice *for Attorneys H. Laddie Montague, Ruthanne Gordon and Matthew P. McCahill* by UNITED CO-OPERATIVE FARMERS, INC.. (Attachments: # 1 Statement As To Why No Brief Is Necessary# 2 Certification of Lisa J. Rodriguez# 3 Certification of H. Laddie Montague, Esquire, in Support of the Motion for Pro Hac Vice Admission# 4 Certification of Ruthanne Gordon, Esquire, in Support of the Motion for Pro Hac Vice Admission# 5 Certification of Matthew P. McCahill, Esquire, in Support of the Motion for Pro Hac Vice Admission# 6 Text of Proposed Order # 7 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 07/27/2007) |
| 07/30/2007 | ● | Pro Hac Vice fee: $ 150, receipt number 346477 re: Gregory K. Arenson, Esq. & receipt number 346476 re: Robert M. Kaplan, Esq. (sr, ) (Entered: 07/30/2007) |
| 07/30/2007 | ● | Set Deadline as to 41 MOTION for Leave to Appear Pro Hac Vice *for Attorney Linda P. Nussbaum*, 42 MOTION for Leave to Appear Pro Hac Vice *for Attorneys H. Laddie Montague, Ruthanne Gordon and Matthew P. McCahill*. Motion Hearing set for 9/10/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE |

| | | |
|---|---|---|
| | | DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 07/30/2007) |
| 07/30/2007 | ❏43 | NOTICE of Appearance by ALYCHIA LYNN DRAGON on behalf of CSX TRANSPORTATION, INC. (DRAGON, ALYCHIA) (Entered: 07/30/2007) |
| 07/30/2007 | ❏44 | Letter from James E. Cecchi Regarding Scruggs and Backstrom Pro Hac Vice Admissions re 25 Letter, 31 Letter, 21 Letter. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(CECCHI, JAMES) (Entered: 07/30/2007) |
| 07/31/2007 | ❏45 | MOTION for Leave to Appear Pro Hac Vice *for Attorney Eric L. Cramer* by UNITED CO-OPERATIVE FARMERS, INC.. (Attachments: # 1 Statement as to Why No Brief is Necessary# 2 Certification of Lisa J. Rodriguez in Support# 3 Certification of Eric L. Cramer, Esquire in Support# 4 Text of Proposed Order# 5 Certificate of Service) (RODRIGUEZ, LISA) (Entered: 07/31/2007) |
| 07/31/2007 | ❏ | Set Deadline as to 45 MOTION for Leave to Appear Pro Hac Vice *for Attorney Eric L. Cramer*. Motion Hearing set for 9/10/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 07/31/2007) |
| 08/01/2007 | ❏46 | MOTION for Leave to Appear Pro Hac Vice by SOMERSET INDUSTRIES, INC.. (Attachments: # 1 Certification Certification of Jan Meyer# 2 Certification Certification of Ronald J. Aranoff# 3 Statement Statement as to why no Brief is Necessary# 4 Text of Proposed Order Proposed Order for admission of Ronald J. Aranoff, Esq. pro hac vice# 5 Certificate of Service Certification of Service)(MEYER, JAN) (Entered: 08/01/2007) |
| 08/01/2007 | ❏47 | Letter from Lindsey H. Taylor Regarding Pro Hac Vice Admission of Theodore J. Leopold. (Attachments: # 1 Declaration of Theodore J. Leopold# 2 Text of Proposed Order)(TAYLOR, LINDSEY) (Entered: 08/01/2007) |
| 08/01/2007 | ❏ | Set Deadline as to 46 MOTION for Leave to Appear Pro Hac Vice. Motion Hearing set for 9/10/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 08/01/2007) |
| 08/01/2007 | ❏ | Pro Hac Vice fee: $ 150, receipt number 346556 re: Reid L. Ashinoff, Esq. (sr, ) (Entered: 08/01/2007) |
| 08/02/2007 | ❏48 | ORDER scheduling oral argument regarding pltf Dust Pro, Inc's motion for admission pro hac vice of Richard F. Scruggs, Esq. & Sidney A. Backstrom, Esq. on 9/10/07 at 2:15 p.m.. Signed by Judge Mark Falk on 8/2/07. (sr, ) (Entered: 08/02/2007) |
| 08/03/2007 | ❏49 | Notice of Request by Pro Hac Vice Reid L. Ashinoff, Esq. to receive |

| | | Notices of Electronic Filings. (GUGIG, MICHAEL) (Entered: 08/03/2007) |
|---|---|---|
| 08/03/2007 | ●50 | MOTION for Leave to Appear Pro Hac Vice *for Attorneys Anthony J. Bolognese and Joshua H. Grabar* by LANCASTER FOUNDRY SUPPLY COMPANY, INC.. (Attachments: # 1 Statement as to Why No Brief is Necessary# 2 Certification of Lisa J. Rodriguez in Support# 3 Certification of Anthony J. Bolognese in Support# 4 Certification of Joshua H. Grabar in Support# 5 Text of Proposed Order# 6 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 08/03/2007) |
| 08/03/2007 | ● | Setting motion hearing as to 50 MOTION for Leave to Appear Pro Hac Vice *for Attorneys Anthony J. Bolognese and Joshua H. Grabar*. Motion Hearing set for 9/10/2007 before Judge Dennis M. Cavanaugh. Please abe advised that this motion will be decided on the papers unless otherwise notified by the Court.(cs, ) (Entered: 08/06/2007) |
| 08/06/2007 | ● | (Court only) ***Party REID L. ASHINOFF added pro hac vice. (cs, ) (Entered: 08/06/2007) |
| 08/06/2007 | ●51 | Letter from James E. Cecchi Regarding Request to Serve Third Party Subpoenas. (Attachments: # 1 Exhibit A# 2 Exhibit B)(CECCHI, JAMES) (Entered: 08/06/2007) |
| 08/08/2007 | ●52 | NOTICE of Appearance by WILLIAM J. O'SHAUGHNESSY on behalf of UNION PACIFIC RAILROAD COMPANY (O'SHAUGHNESSY, WILLIAM) (Entered: 08/08/2007) |
| 08/08/2007 | ●53 | MEMORANDUM OF LAW by Somerset Industries, Inc. in opposition to Movant's Quality Refractories Installation, Inc. request for transfer and consolidation of related Antitrust Actions to the Eastern Dist of Pennsylvania and in further support of Movant, Dust Pro, Inc.'s motion for transfer and consolidataion filed by SOMERSET INDUSTRIES, INC. (Attachments: # 1 Certificate of Service)(cs, ) (Entered: 08/09/2007) |
| 08/13/2007 | ● | (Court only) ***Party MAROON INCORPORTATED rep by JARED BENNETT STAMELL added. (jd, ) (Entered: 08/13/2007) |
| 08/13/2007 | ●54 | Letter from Michael R. Griffinger to the Honorable Dennis M. Cavanaugh re 51 Letter. (GRIFFINGER, MICHAEL) (Entered: 08/13/2007) |
| 08/14/2007 | ●55 | Letter from James E. Cecchi to Hon. Dennis M. Cavanaugh. (FLAX, MELISSA) (Entered: 08/14/2007) |
| 08/16/2007 | ●56 | MOTION for Leave to Appear Pro Hac Vice *for Attorneys Guido Saveri, R. Alexander Saveri and Cadio Zirpoli* by UNITED CO-OPERATIVE FARMERS, INC.. (Attachments: # 1 Statement as to Why No Brief is Necessary# 2 Text of Proposed Order # 3 Certifications of Guido Saveri, Esquire, R. Alexander Saveri, Esquire and Cadio Zirpoli, Esquire in Support# 4 Certification of Lisa J. Rodriguez in Support# 5 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 08/16/2007) |

| 08/17/2007 | ❍ | Set Deadline as to 56 MOTION for Leave to Appear Pro Hac Vice *for Attorneys Guido Saveri, R. Alexander Saveri and Cadio Zirpoli*. Motion Hearing set for 9/10/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 08/17/2007) |
| 08/24/2007 | ❍57 | Letter from James E. Cecchi re 48 Order. (CECCHI, JAMES) (Entered: 08/24/2007) |
| 08/24/2007 | ❍ | (Court only) ***Party COMPLETE TRANSPORTATION SYSTEMS, INC. rep by CHRISTOPHER A. SEEGER added. (jd, ) (Entered: 08/24/2007) |
| 08/31/2007 | ❍58 | ORDER granting 41 Motion for Leave to Appear Pro Hac Vice re: Linda Nussbaum. Signed by Judge Mark Falk on 8/30/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍59 | ORDER granting 42 Motion for Leave to Appear Pro Hac Vice re: Laddie Montague, Jr.,Ruthanne Gordon & Matthew P. McCahill. Signed by Judge Mark Falk on 8/30/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍60 | ORDER granting 45 Motion for Leave to Appear Pro Hac Vice re: Eric L. Cramer. Signed by Judge Mark Falk on 8/30/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍61 | ORDER granting 46 Motion for Leave to Appear Pro Hac Vice re: Ronald J. Aranoff. Signed by Judge Mark Falk on 8/30/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍62 | ORDER granting 56 Motion for Leave to Appear Pro Hac Vice re: Guido Saveri, R. Alexander Saveri,Cadio Zirpoli. Signed by Judge Mark Falk on 8/30/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍63 | ORDER granting 50 Motion for Leave to Appear Pro Hac Vice re: Anthony J. Bolognese & Joshua H. Grabar. Signed by Judge Mark Falk on 8/31/07. (sr, ) (Entered: 08/31/2007) |
| 08/31/2007 | ❍64 | ORDER admitting Theodore J. Leopold pro hac vice. Signed by Judge Mark Falk on 8/31/07. (sr, ) (Entered: 08/31/2007) |
| 09/04/2007 | ❍65 | Letter from Seeger Weiss to Judge Cavanaugh. (SEEGER, CHRISTOPHER) (Entered: 09/04/2007) |
| 09/05/2007 | ❍66 | Letter from James E. Cecchi. (CECCHI, JAMES) (Entered: 09/05/2007) |
| 09/05/2007 | ❍ | Pro Hac Vice fee: $ 150, receipt number 347039 re: Ruthanne Gordon (sr, ) (Entered: 09/05/2007) |
| 09/05/2007 | ❍ | Pro Hac Vice fee: $ 150, receipt number 347038 re: Matthew P. McCahill (sr, ) (Entered: 09/05/2007) |
| 09/05/2007 | ❍ | Pro Hac Vice fee: $ 150, receipt number 347035 re: Eric L. Cramer (sr, ) (Entered: 09/05/2007) |

| | | |
|---|---|---|
| 09/05/2007 | 🔘 | Pro Hac Vice fee: $ 150, receipt number 347036 re: H. Laddie Montague (sr, ) (Entered: 09/05/2007) |
| 09/06/2007 | 🔘67 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) for Attorneys H. Laddie Montague, Jr., Ruthanne Gordon, Matthew P. McCahill and Eric L. Cramer by UNITED CO-OPERATIVE FARMERS, INC., ISSAC INDUSTRIES, INC., BAR-ALE, INC.. (RODRIGUEZ, LISA) (Entered: 09/06/2007) |
| 09/06/2007 | 🔘68 | Notice of Request by Pro Hac Vice H. Laddie Montague, Jr., Ruthanne Gordon, Matthew P. McCahill and Eric Cramer to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 09/06/2007) |
| 09/06/2007 | 🔘 | Pro Hac Vice fee: $ 150, receipt number 347059 re: Ronald J. Aranoff (sr, ) (Entered: 09/10/2007) |
| 09/07/2007 | 🔘 | (Court only) ***Party H. LADDIE MONTAGUE, JR, and ERIC L. CRAMER, and RUTHANNE GORDON, and MATTHEW P. MCCAHILL added. (sr, ) (Entered: 09/07/2007) |
| 09/07/2007 | 🔘69 | Notice of Request by Pro Hac Vice Ronald J. Aranoff, Esq. to receive Notices of Electronic Filings. (MEYER, JAN) (Entered: 09/07/2007) |
| 09/07/2007 | 🔘70 | AFFIDAVIT of Jan Meyer, Esq. *Attesting Compliance with Rule 1:28-2 (a) for Attorney Ronald J. Aranoff, Esq.* by SOMERSET INDUSTRIES, INC.. (MEYER, JAN) (Entered: 09/07/2007) |
| 09/10/2007 | 🔘 | (Court only) ***Party RONALD J. ARANOFF added. (sr, ) (Entered: 09/10/2007) |
| 09/10/2007 | 🔘 | Minute Entry for proceedings held before Judge Mark Falk : Miscellaneous Hearing held on 9/10/2007. Plaintiff's motion for pro hac vice granted. (Tape #07-09.) (LM, ) (Entered: 09/11/2007) |
| 09/11/2007 | 🔘 | Pro Hac Vice fee: $ 450.00, receipt number 347123 Guido Saveri, R. Alexander Saveri, Cadio Zirpoli (sr, ) (Entered: 09/11/2007) |
| 09/12/2007 | 🔘71 | ORDER permitting Richard Scruggs & Sidney Backstrom to appear pro hac vice. Signed by Judge Mark Falk on 9/10/07. (sr, ) (Entered: 09/12/2007) |
| 09/13/2007 | 🔘72 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) for Attorneys Guido Saveri, R. Alexander Saveri and Cadio Zirpoli by UNITED CO-OPERATIVE FARMERS, INC.. (RODRIGUEZ, LISA) (Entered: 09/13/2007) |
| 09/13/2007 | 🔘73 | Notice of Request by Pro Hac Vice Attorneys Guido Saveri, R. Alexander Saveri and Cadio Zirpoli to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 09/13/2007) |
| 09/14/2007 | 🔘 | (Court only) ***Party GUIDO SAVERI, and R. ALEXANDER SAVERI, and CADIO ZIRPOLI added. (sr, ) (Entered: 09/14/2007) |
| 09/17/2007 | 🔘 | Pro Hac Vice fee: $ 150, receipt number 347230 re: Paul Donovan (sr, ) (Entered: 09/17/2007) |

| 09/17/2007 | 🔵 | Pro Hac Vice fee: $ 150, receipt number 347231 re: Theodore Leopold (sr, ) (Entered: 09/17/2007) |
|---|---|---|
| 09/17/2007 | 🔵 | Pro Hac Vice fee: $ 750, receipt number 347229 re: Stephen Neuwirth, Daniel Brockett, David Azar, Richard Scruggs & Sidney Backstrom (sr, ) (Entered: 09/17/2007) |
| 09/18/2007 | 🔵74 | Notice of Request by Pro Hac Vice Stephen Neuwirth, Daniel Brockett, David Azar, Richard Scruggs, Sidney A. Backstrom, Paul Donovan and Theodore J. Leopold to receive Notices of Electronic Filings. (TAYLOR, LINDSEY) (Entered: 09/18/2007) |
| 09/19/2007 | 🔵75 | WAIVER OF SERVICE Returned Executed by COMPLETE TRANSPORTATION SYSTEMS, INC.. CSX TRANSPORTATION, INC. waiver sent on 8/22/2007, answer due 10/22/2007. (SEEGER, CHRISTOPHER) (Entered: 09/19/2007) |
| 09/19/2007 | 🔵 | (Court only) ***Party STEPHEN NEUWIRTH, and DANIEL BROCKETT, and DAVID AZAR, and RICHARD SCRUGGS, and PAUL DONOVAN, and THEODORE J. LEOPOLD added. (sr, ) (Entered: 09/19/2007) |
| 09/21/2007 | 🔵76 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) for Attorney Linda Nussbaum by ISSAC INDUSTRIES, INC.. (RODRIGUEZ, LISA) (Entered: 09/21/2007) |
| 09/21/2007 | 🔵77 | Notice of Request by Pro Hac Vice Linda Nussbaum to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 09/21/2007) |
| 09/21/2007 | 🔵 | (Court only) ***Party LINDA P NUSSBAUM added. (sr, ) (Entered: 09/21/2007) |
| 09/21/2007 | 🔵78 | MOTION for Leave to Appear Pro Hac Vice *for Attorneys Robert G. Pahlke, Terry Gross and Adam C. Belsky* by STATELINE BEAN PRODUCERS COOPERATIVE. (Attachments: # 1 Statement As To Why No Brief Is Necessary# 2 Certification of Lisa J. Rodriguez# 3 Certification of Robert G. Pahlke# 4 Certification of Terry Gross# 5 Certification of Adam C. Belsky# 6 Text of Proposed Order # 7 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 09/21/2007) |
| 09/21/2007 | 🔵 | Pro Hac Vice fee: $ 150, receipt number 347324 re: Linda Nussbaum, Esq. (sr, ) (Entered: 09/21/2007) |
| 09/21/2007 | 🔵 | Set Deadline as to 78 MOTION for Leave to Appear Pro Hac Vice *for Attorneys Robert G. Pahlke, Terry Gross and Adam C. Belsky*. Motion Hearing set for 10/22/2007 before Judge Dennis M. Cavanaugh. (PLEASE BE ADVISED THAT THIS MOTION WILL BE DECIDED ON THE PAPERS UNLESS OTHERWISE NOTIFIED BY THE COURT) (sr, ) (Entered: 09/21/2007) |
| 09/24/2007 | 🔵79 | Letter from James E. Cecchi re: subpoena order. (CECCHI, JAMES) (Entered: 09/24/2007) |
| 09/24/2007 | 🔵80 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28- |

| | | |
|---|---|---|
| | | 2(a) for Attorneys Anthony J. Bolognese and Joshua H. Grabar by LANCASTER FOUNDRY SUPPLY COMPANY, INC.. (RODRIGUEZ, LISA) (Entered: 09/24/2007) |
| 09/24/2007 | ●81 | Notice of Request by Pro Hac Vice Attorneys Anthony J. Bolognese and Joshua H. Grabar to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 09/24/2007) |
| 09/24/2007 | ●82 | Letter from Lindsey H. Taylor Enclosing Stipulation Extending Time to Answer. (Attachments: # 1 Text of Proposed Order)(TAYLOR, LINDSEY) (Entered: 09/24/2007) |
| 09/24/2007 | ● | Pro Hac Vice fee as to Anthony J. Bolognese and Joshua H. Grabar: $ 300.00, receipt number 347333 (jd, ) (Entered: 09/24/2007) |
| 09/24/2007 | ●83 | ORDER granting pltfs appl. to serve four third party subpoenas in the form and in the manner identified in its 8/6/07 letter. Signed by Judge Dennis M. Cavanaugh on 9/24/07. (sr, ) (Entered: 09/25/2007) |
| 09/25/2007 | ● | (Court only) ***Party ANTHONY J. BOLOGNESE, and JOSHUA H. GRABAR added. (sr, ) (Entered: 09/25/2007) |
| 09/27/2007 | ● | (Court only) ***Party AGWAY LIQUIDATING TRUST added. (jd, ) (Entered: 09/27/2007) |
| 09/27/2007 | ● | (Court only) ***Attorney JARED BENNETT STAMELL for AGWAY LIQUIDATING TRUST added. (jd, ) (Entered: 09/27/2007) |
| 09/27/2007 | ● | (Court only) ***Party FAYUS ENTERPRISES added. (dc, ) (Entered: 09/27/2007) |
| 10/09/2007 | ●84 | ORDER re: extension of time to respond to complt.. Signed by Judge Mark Falk on 10/05/07. (sr, ) (Entered: 10/09/2007) |
| 10/11/2007 | ●85 | ORDER granting 78 Motion for Leave to Appear Pro Hac Vice re: Robert G. Pahlke, Terry Gross & Adam C. Belsky. Signed by Judge Mark Falk on 10/10/07. (sr, ) (Entered: 10/11/2007) |
| 10/15/2007 | ● | Pro Hac Vice fee: on behalf of Robert Pahlke/Terry G. Ross $ 300, receipt number 347736 (cs, ) (Entered: 10/15/2007) |
| 10/15/2007 | ● | Pro Hac Vice fee: as to Adam C. Belsky, Esq. $ 150, receipt number 347737 (cs, ) (Entered: 10/15/2007) |
| 10/15/2007 | ●86 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) *for Attorneys Robert G. Pahlke, Terry Gross and Adam C. Belsky* by STATELINE BEAN PRODUCERS COOPERATIVE. (RODRIGUEZ, LISA) (Entered: 10/15/2007) |
| 10/15/2007 | ●87 | Notice of Request by Pro Hac Vice Robert G. Pahlke, Terry Gross and Adam C. Belsky to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 10/15/2007) |
| 10/16/2007 | ● | (Court only) ***Party SIDNEY A. BACKSTROM added. (nr, ) (Entered: 10/16/2007) |

| 10/17/2007 | ⊜88 | MOTION for Leave to Appear Pro Hac Vice *for Attorney Reginald Terrell* by FAYUS ENTERPRISES. (Attachments: # 1 Statement As to Why No Brief is Necessary# 2 Certification of Lisa J. Rodriguez# 3 Certification of Reginald Terrell, Esquire, in Support of the Motion for Pro Hac Vice Admission# 4 Text of Proposed Order # 5 Certificate of Service)(RODRIGUEZ, LISA) (Entered: 10/17/2007) |
| --- | --- | --- |
| 10/17/2007 | ⊜ | Setting Deadlines as to 88 MOTION for Leave to Appear Pro Hac Vice *for Attorney Reginald Terrell*. Motion Hearing set for 11/12/2007 before Judge Dennis M. Cavanaugh. Please be advised that this motion will be decided on the papers unless otherwise notified by the Court. (mn, ) (Entered: 10/17/2007) |
| 10/19/2007 | ⊜89 | ORDER granting 88 Motion for Leave to Appear Pro Hac Vice as to Reginald Terrell. Signed by Judge Mark Falk on 10/17/07. (jd, ) (Entered: 10/19/2007) |
| 10/30/2007 | ⊜90 | AFFIDAVIT of Lisa J. Rodriguez Attesting Compliance with Rule 1:28-2(a) for Attorney Reginald Terrell by FAYUS ENTERPRISES. (RODRIGUEZ, LISA) (Entered: 10/30/2007) |
| 10/30/2007 | ⊜91 | Notice of Request by Pro Hac Vice Reginald Terrell to receive Notices of Electronic Filings. (RODRIGUEZ, LISA) (Entered: 10/30/2007) |
| 10/30/2007 | ⊜ | Pro Hac Vice fee: $ 150, receipt number 348022 re: Reginald Terrell, Esq. (sr, ) (Entered: 10/30/2007) |
| 10/30/2007 | ⊜ | (Court only) ***Party REGINALD TERRELL added. (sr, ) (Entered: 10/30/2007) |
| 11/05/2007 | ⊜92 | Letter from James E. Cecchi to Judge Cavanaugh re: Stipulation and Proposed Order. (CECCHI, JAMES) (Entered: 11/05/2007) |
| 11/27/2007 | ⊜93 | CERTIFIED COPY OF ORDER purs to MDL transferring case to the USDC for the District of Columbia. (sr, ) (Entered: 11/28/2007) |
| 11/28/2007 | ⊜ | ***Civil Case Terminated. (sr, ) (Entered: 11/28/2007) |

